Statement of. the Case.
MONROE, J.
Plaintiff alleges that he was employed by defendant as manager of a ■dairy, for a term of' three years, beginning January 1, 1905; that his compensation was to be $100 a month, one-third of the profits of the business, and a one-third interest in the increase of a herd of Jersey cattle which defendant was to furnish; that he entered said employment in December, 1904, and performed the duties thereof until September 11, 1905, when he was discharged without serious cause of complaint; and he prays judgment for $0,655, with interest, including therein $205 for salary due \ip to September 1st, $150 as one-third of the value of the increase in the herd to that date, $500 as one-third of the value of such increase from September 1st to the expiration of the term of the contract, and $2,800 as representing one-third of the profits of the business during the whole of said term.
Defendant denies that he entered into the contract set up by plaintiff, and alleges that he, H. L. Skannal, and plaintiff agreed to form a corporation, to be known as the “Sligo Dairy Company, Limited,” with a capital stock of $10,000, of which each of them was to take one-third, but that, as plaintiff was without means, it was understood that the two Skannals were to furnish the cattle and make the advances necessary for the business; that plaintiff was to give his note for his subscription, with his stock as security; that his associates were to apply his interest in the profits to the payment of the same; that plaintiff was to be made “manager of said corporation at a salary of $100 a month, which said salary was agreed should be paid by said corporation; and that said agreement of employment was not to be for any determinate time.” He further alleges that, pursuant to said agreement, property was leased, and that he and H. L. Skannal stocked it with cattle and began improving it, and that plaintiff was installed as manager; that the charter and stock subscription list of the proposed company were prepared about January 20, 1905, and were then signed by the two Skannals, and also by J. B. Johnson, whom it was agreed to take in as a subscriber for one share of stock; but that plaintiff, though repeatedly requested so to do, failed to sign said charter and subscription list, and was thereupon, about September 11, 1905, notified that his services as manager were no longer required. Defendant specially denies that he contracted any personal obligation to plaintiff, and prays that the demand of the latter be rejected.
The following is the substance of the material testimony given upon the trial, to wit:
Plaintiff testifies that on December 15,1904, on the banquette in front of the store of Ardis & Co., Limited, in Shreveport, he and defendant entered into the contract as set forth in the petition: that H. L. Skannal was not present, and that he (plaintiff) was not then acquainted with him; that nothing was then said about the Sligo Dairy Company, Limited, and that the idea of establishing a corporation was suggested to him by defendant in January following; that his reply to the suggestion was that he had no objection, provided the contract already made by him was left undisturbed; that he.heard nothing further about the matter until March, when de *9 fendant told him that the papers were ready to be signed, and that he replied that he was too busy to go to town for that purpose, but would sign them if they were brought to him and were all right according to the original agreement; that defendant’s proposition as to the corporation was that plaintiff should subscribe $1,000 to the stock, to be paid from the profits of the business or otherwise, and that, on payment of said amount, he should acquire one-third proprietary interest in the cattle, valued at $3,000, furnished by defendant ; that he was spoken to but twice in eight months about signing the charter and subscription list, and for several months prior to his discharge had not been spoken to on that subject, and that it was not referred to on that occasion, the only reason assigned for his discharge being that the business had incurred debt, and that defendant was unwilling to pay him more than $50 per month; that, in the meanwhile (i. e., from about the date of the original contract), he had been discharging the duties for which he was employed, and that the debt referred to by defendant consisted of money expended or obligations incurred, under the orders and supervision of defendant, in making improvements upon the property which had been leased for the purposes of the dairy'; that about July 1st defendant made some objection to his (plaintiff’s) drawing $100 a month, as1serting that the amount agreed on was $75, but that plaintiff told him he knew better, and that a day or two later defendant admitted that the salary was $100 a month; and that he so admitted when he discharged plaintiff, and offered to pay the balance which he found to be due, at that rate, up to September 1st.
George H. Russell, sworn for plaintiff, testifies that, in a conversation with plaintiff and defendant, whilst the work of improvement at the dairy was in progress, or, perhaps, about the time it was begun, he congratulated both .of them upon the arrangement that had been made and spoke of his own contract with the company; that plaintiff said, “I have one longer than yours;” that witness said that his was for two years, to which plaintiff replied that his was for three years; and that defendant then said, “Tes, sir; I employed Mr. Thurmond to take charge of the Sligo Dairy Company, and I give him $100 a month and one-third of the profits.”
E. M. Hoyer, sworn for plaintiff, testifies that he heard that plaintiff was going to leave, and that he met defendant and asked what the trouble was, and that defendant said that plaintiff had run the dairy into debt to some extent and he (defendant) had to cut down expenses; that he had offered plaintiff $50 a month, and thought he would accept it.
M. H. Roach, sworn for plaintiff, testifies that he went to see plaintiff, and that Skannal and Brandon came along (Brandon being the man whom Skannal had brought to the place to supersede plaintiff); that they began to talk, and that witness started away, when Skannal (defendant) called him back; that they talked about plaintiff’s staying on the place, and that Skannal told plaintiff he would have to take $50 a month, in money, and credit his account with $50, or leave;' and that plaintiff said that he could not support his family on $50 a month.
J. B. Johnson, sworn for plaintiff, testifies that he is secretary and bookkeeper of Ardis & Co,, Limited (a firm which seems to have acted as the bankers of defendant); that he accepted a share of stock in, and the treasurership of, the Sligo Dairy Company, Limited, at the request of defendant and in order to make up the corporation; that he had no conversation with plaintiff, and had no personal knowledge of the latter’s contract with' defendant; that defendant told him that plaintiff had to be paid $100 a month; that, probably in' December, 1904, though he is not sure of the date, an account in the name of the Sligo Dairy Company, Limited, was opened on the books of Ardis *11 & Co., Limited, and that the amounts paid plaintiff were charged to that account; that it was opened because witness believed there was such a corporation, but that he had not been instructed by Ardis & Co. to open the account in that way; that there was never any meeting of the dairy company to his knowledge; and that he gave no order looking to plaintiff’s discharge.
John A. Skannal, defendant, testifies that, individually, he never employed plaintiff; that plaintiff had told him that he would like to go into the country to live, and witness suggested that he (witness) and Henry L. Skannal had a herd of cattle that were unprofitable, where they were, and that if they could get a place nearer town they would go into an organization with plaintiff by which the latter could make something. The witness then continues (quoting his language) :
“Based on that, we continued to wrangle until we agreed on a trade — that Henry and myself were to put the cattle in at $60, or $65, apiece, and money enough to make up about $10,000. I figured the improvements would cost about $4,500 to $5,000 — could not tell exactly— and that was the basis on which we figured on the stock company. * * * Finally, we made a proposition to Ardis & Co. to buy the place. They were anxious to sell, and we agreed to buy. I got to thinking the thing over, that it might be a failure, and I went to Bryan Ardis and told him. Q. You did not buy the place? A. No, sir; finally we got Henry Skannal over there, and Henry Skannal, T. H. Thurmond, and myself — down in front of Ardis’ store— we agreed to form this stock company. That was the original agreement — to be a stock company, in which Thurmond was to get $100 a month and one-third interest; he giving his notes for one-third interest, and we carrying the notes, and he would finally work it out. Q. Now, how was the stock to be divided? A. One-third to Henry Skannal, one-third to me, and one-third to Thurmond. After that we agreed that Johnson would take a share and act as secretary for us. * * * Q. Did you ever have any conversation with Mr. Thurmond, at any time or place, except with a view of organizing this company? A. Never in my whole life. Q. From the inception of the matter, the Sligo Dairy Company, Limited, was discussed; from the first? A. Yes, sir. Q. How was his share of the stock to be paid for? A. We were to take his notes and carry them for him, and he was to work it out. * * * Q. How came Thurmond to go over there and go to work before having the charter drawn up? A. We wanted to get the thing organized, had a lot of building to do, and we agreed, the three of us — Thurmond, Henry Skannal, and myself— that we would commence work on the building in anticipation of the completing of the stock company. * * * Q. Mr. Skannal, when did you take this lease? A. I think it was on the 2d day of January. Q. State if, at any time, you called on Murff & Webb to prepare a charter. A. Yes, sir; I think right after the 1st of January. I went and clipped a charter from the newspaper, and substituted our names, and, when I thought I had it about right, I took it to Murff & Webb and asked them to complete it for me, in a legal way. * * * Q. When Thurmond went there, was there any definite time fixed that he was to work? A. None at all. It was an experiment. He was to go there by the month. :|! * * Q. Now, Mr. Skannal, did you notify Mr. Thurmond that this charter had been prepared? A. Yes, sir; several times. * * * Q. This agreement you had with him, what month was that? A. December. Q. You leased the place the 2d of January? A. Yes, sir. Q. The charter was signed about the 20th of January? A. Yes, sir. Q. Then his employment, as I understand, was just temporary? A. Yes, sir; until we could organize the company, get it in legal shape, and shape up the business, issue his stock, and take his notes, etc. Q. Why did you release Thurmond? A. Well, I knew he had not signed the agreement, and the way the thing was going there was no legal company in existence, and Henry Skannal and I were bound for the debts, and I was not willing to go on in any such shape. Q. Something was said about $50 a month offer? A. That was along, I think, about the 11th of September. Thurmond was there about two weeks after I discharged him, and I finally told him — brought Brandon over. I said: ‘You have been so extravagant, I am going to put Brandon in your place, from now on. From now on, Brandon is manager of this dairy company. If you want to go ahead, if you are willing to take a subordinate place, and work for $50 a month, pay $50 on your account’ — these debts — why. he could go on. I was disgusted. Q. How much were these debts? A. Nine thousand seven hundred and some odd dollars, on the 1st of September. There are the figures, exactly; money that we had paid out under his management. Q. To say nothing of your cattle? A. Yes, sir; not to mention the cattle. I have 91 head now. Q. How long did he run the business that way before you stopped him? A. I think he ran the business until the 1st of September. Q. He had been drawing pay? A. I think we figured up that the company owed him — as the statement shows — $205.”
Cross-examined:
“Q. You prepared the receipt that was read this morning, for $205? A. Yes, sir; I wrote *13 up the receipt and offered him the $205 as president of the company. Q. Have you not, some time before this, had a dispute as to the amount he was to draw each month? A. I was in doubt whether it was $75 or $100 that we had agreed on, and he says. 'You ask Henry whether it was $100 or $75 that we have agreed upon, and I says. ‘The first time I see him I’ll ask him.’ I asked him, and he said it was $100 a month. Q. Did he not tell you to ask Col. Ardis? A. No, sir; he told me to ask Henry Skannal. Ardis was not there.”
Henry Skannal, sworn for defendant, gives his version of the matter, as follows:
“It was on the sidewalk in front of Ardis & Co.’s. Of course, we discussed the matter and talked it over, as much as we had time, and we decided to form a corporation on a basis of $10,000 capital stock, figuring the cows at $60. We had between 60 and 65 cows, and we figured that the improvements would amount to the balance, and the mules that we had to buy. It was all agreed on. Thurmond said he had no money, and we knew he had none, and we would have to issue his stock, and he would give his note, with his stock as security, and we were to carry the note until his profits should pay for it. Q. Was that thoroughly agreed on between you, John Skannal, and T. H. Thurmond? A. Yes, sir. Q. Was anything else agreed upon about the charter? A. Well, nothing much was said about the charter. I told John Skannal to go ahead and have it written up, and when I came over again, which I think was in January, he told me that he was working on it. Later on he told me it was ready, and I went in and signed it, and went by Ardis & Co.’s and told Mr. Johnson to tell Mr. Thurmond it was ready for signing. Q. What was the understanding between Thurmond, John Skannal, and yourself as to whom Thurmond was working for? A. He was working for the dairy company. Q. Was any definite time agreed on as to how long he was to work in that capacity? A. No, sir. Q. What was the discussion as to how long that management should remain? A. Why, of course, we did not know. We were going into a new business and as long as everything went well we would remain that way. * * *”
Cross-examination:
“Q. What you know about this stock company you got from Mr. Skannal or Mr. Thurmond? A. We started it among ourselves. John Skannal and I first talked of it, and then, when we met Mr. Thurmond, we discussed it -with him. Q. On what condition was Thurmond to go over to the Dillard place and take charge? A. He was to receive $100 a month and take one-third interest in the stock. Q. He was to have $100 a month and a one-third interest in the profits of the business, as salary? A. Yes, sir; and his part of the profits * * * was to go towards paying for his part of the stock. Of course, that was just a verbal agreement. * * * Q. He was to get $100 a month? A. Yes, sir; he said it took that to live on.”
Redirect:
“Q. The only conversation you over had with them was between you, John Skannal, and Thurmond, in front of Ardis & Co.’s store? A. Yes, sir; I do not know what they had said about it before that.”
R. D. Webb, sworn for defendant, testifies that the charter of the dairy company was prepared between the 1st and 20th of January, and was signed by the Skannals about the date last mentioned, but was not signed by Thurmond.
Plaintiff, called in rebuttal, testifies as follows:
“Q. Mr. Thurmond, in making this agreement or contract, with whom did you talk? A. John Skannal. Q. Exclusively? A. Yes, sir. Q. When did you first know Mr. Henry Skannal? A. Some time in January. Q. How long after you had entered into this contract? A. About a month. Q. Was anything said, at the time you made the first contract, about this corporation? A. No, sir. Q. Was anything said about the time you were to work? A. Yes, sir; for three years. He said that, if I did not agree ro take it for three years, he would no l have anything to do with it, because it cost considerable to start up. I told him I would do what I could to make a success, and, if the Lord spared my life, I would stay with him.”
Beyond this, it appears that the expenses involved in the improvement of the leased premises were incurred under the authority of the defendant, who personally contracted for and supervised the work, and there is no support whatever in the record for the imputation of extravagance which defendant makes against plaintiff; nor do we find anything to indicate that plaintiff did not, up to the moment of his discharge, faithfully and efficiently perform the duties to which he was assigned. The project of the charter of the dairy company (which charter has never been perfected) provides that the board of directors “shall appoint such agents, employés, and servants as it may deem necessary to conduct the business of the corpora *15 tion, fix the compensation and term of service, with the right to dismiss them at said board’s pleasure, and said board shall have the right to fix and determine the salaries of the several officers herein provided for.” There is no'provision whatever in regard to a manager, and T. H. Thurmond is named as treasurer of the company, a position which it is conceded was to be filled by J. B. Johnson. There was a judgment in the district court in favor of the plaintiff in the sum of $3,005, with interest from the date of said judgment; and thereupon defendant moved for a new trial, on the ground of newly discovered evidence, alleging and making affidavit that:
. “Since the trial he has discovered for the first time that J. B. Ardis and C. H. Ardis are material witnesses * * * by whom defendant can prove that they were present, in December, 1904, and heard John A. Skannal, Henry L. Skannal, and T. H. Thurmond discuss the terms and conditions upon which the said Thurmond was to take charge of the dairy business in Bossier parish for the Sligo Dairy Company, Limited, which was agreed between said parties should be organized and put in operation,” etc.
This, in turn, was supported by the affidavit of J. B. Ardis to the effect that:
“During the month of December, 1904, John A.Skannal, Henry L. Skannal, and Trirus IT. Thurmond met in front of his store, * * * and in his presence discussed for some time the organization of the corporation known as the Sligo Dairy Company, Limited; * * * .that said parties, * * * after having discussed the formation of the corporation among themselves, came into his office and stated to him that the corporation would be formed, in which each of the three should take one-third of the stock, and of which Mr. Thurmond would be made manager at a salary of $100 a month; * * * that all this was discussed and rediscussed and agreed upon, as he understood it, prior to the taking charge of the property * * * by Mr. Thurmond, as manager of said contemplated corporation; * * * that the said John A. Skannal and Henry L. Skannal met the said T. H. Thurmond in front of the store of Ardis & Co., Limited, and also in their office, and discussed the organization of the company, leaving said place' of business and going over to the Dillard place together, with a view of arranging all the details more closely.”
And there is more to the like purport. This was supplemented by the testimony of defendant’s counsel, given on the hearing of the motion, as follows:
“Mr. Skannal, the defendant in the case, told me that J. B. Ardis— We sent for J. B. Ardis, because we expected to use him as a witness. When Mr. Ardis came into the courtroom, I took him to the back of the courtroom to talk with him before putting him on the stand. I asked him if he knew anything about the contract between Skannal and T. H. Thurmond, and he told me, ‘No;’ that he did not hear the contract between Skannal and Thurmond; that he had since heard about it, and he knew nothing about the facts; that Thurmond had never said anything about it, and he only heard about the contract between Skannal and Thurmond since the case came up. Taking this statement of facts, I did not put him on the stand. Since the trial of the case, he talked with me and told me that he thought that I had reference to the contract that Thurmond relied on, between Mm and Skannal, and he did not think that I meant the contract between Thurmond and the Sligo Dairy Company — the organization of the company — and I learned this after the case had been tried; and J. B. Ardis stated to me that it was clearly a misunderstanding as to what contract I was asking about. We thought, in the beginning, that J. B. Ardis was a material witness, and had him brought into court for that purpose.”
As against this, there is a counter affidavit by plaintiff in which he—
“Emphatically denies that C. H. Ardis or J. B. Ardis were, either, ever present or near enough to hear the conversation between him and the defendant when his employment was being discussed on the outer edge of the sidewalk in front of the business house of Ardis & Co. in the city of Shreveport.”
And plaintiff’s counsel makes affidavit that:
“When the case * * * was set for trial, C. IT. Ardis was duly summoned by plaintiff; * * * that said Ardis duly appeared, * * * and * * * stated to him that he preferred not to testify in the case; and that he knew nothing about the case that would be of any value to either party to the suit.”
Upon the showing thus made, the judge a quo refused the new trial, and defendant appealed.
Opinion.
In testifying as to the making of the alleged contract upon which he relies, defendant states that “Ardis was not there”; and in so stating he probably refers to C. H. *17 Ardis, -who is conceded to be now dead. It was, however, asserted in the course of the argument, - and without contradiction, that J. B. Ardis attended the trial in the district court, apparently as the interested friend of the defendant, and, unless both he and the defendant knew that the information which he possessed had little or no bearing upon the main issue, we can conceive of no reason why he should not have been placed upon the stand. Defendant certainly knew, though his counsel did not, whether the proposed witness was present upon the occasion when the contract upon which plaintiff sues was made; but both defendant and I-I. L. Skannal, throughout their testimony, say that there were present on that occasion J. A. Skannal, 1-1. L. Skannal, and defendant, and they mention no one else. Mr. Ardis, in his affidavit, goes farther than either of them, and particularly so when he speaks of their “leaving said place of business” (meaning the store of Ardis & Co., Limited) “and going to the Dillard place” (meaning the dairy farm), “together, with a view of arranging all the details” (of their contract) “more closely” — a circumstance of which the parties referred to could not have been ignorant, but which neither of them mentioned in the testimony given by him. Upon the whole, we find no reason to disturb the ruling of the judge a quo refusing the new trial; the matter being one appealing largely to his discretion.
Considering the case as presented, there is a radical conflict between the testimony of the plaintiff and that of the defendant, since plaintiff swears positively to the contract set up in the petition, and defendant swears that no such contract was made. So far as H. L. Skannal is concerned, the contract set up by plaintiff may have been made without his knowledge, since, after testifying to what took place in his presence, he says, “I do not know what they had said about it before that.” That they (meaning plaintiff and defendant) had said something about it before is conceded by both sides. Plaintiff testifies that Skannal had approached him on the subject in November, and that they had made the contract sued on before he had ever met H. L. Skannal. Defendant testifies that plaintiff had repeatedly expressed to him a desire to go to the country, and that he had suggested the organization of a company whereby the unprofitable cattle owned by him and H. L. Skannal might be utilized to the advantage of all parties, and (he goes on to say), “based on that, we continued to wrangle until we agreed on a trade,” etc. Plaintiff and defendant, therefore, concur to the effect that they had “agreed on a trade” before H. L. Skannal was called into their deliberations. The question, then, is, what was the trade agreed on? Plaintiff swears, with circumstance and precision, that it was as stated in his petition, and his testimony is reasonable and consistent throughout, and is corroborated where corroboration is possible; whereas, the testimony of defendant, that the “trade” was otherwise than as stated by plaintiff, does not appeal very strongly to reason and lacks corroboration where corroboration was to have been expected.
We think the theory propounded in the testimony of the plaintiff (that he was to be secured a salary of $100 a month and was to get one-third of the profits of the business and one-third of the increase in the herd) a reasonable one, because the record justifies the inference that he was regarded as a capable, energetic man, who might be able to turn an unprofitable herd of cattle to account, even though he had had no previous experience as a dairyman. He was, however, without means, and he required $100 a month to support his family, and his testimony to the effect that he stipulated for that amount is corroborated by every witness who has testified in the case, with the possible exception of the defendant. H. L. Skannal, *19 being asked: “He was to have $100 a month and one-third interest in the profits of the business?” replies:
“Yes, sir; and his part of the profits was to go towards paying his part of the stock. Q. He was to get $100 a month? A. Yes, sir; he said it took that to live on.”
The defendant, on the other hand, would have it appear that plaintiff was to apply one-half of the amount necessary for the support of his family to the payment of a stock subscription, amounting to over $3,000, though the only effect of such payment (if he be correct in other particulars) would have been to make him one-third owner of the property of which he was already entitled to one-third of the revenues and increase. All that the contract set up hy plaintiff promised him, beyond a mere subsistence, was one-tbird of the profits of an untried business (the establishment of a dairy in the vicinity of Shreveport) and a one-third interest in the increase of a small herd (32 cows, 1 hull, and 10 calves) of Jersey cattle. During the eight months that plaintiff was in charge the expenditures were necessarily heavy, and, having his customers to find and his business to build up, tbe profits were nil. When he was discharged, however, the cattle were in better condition than when he received them, he had something like 120 customers, and, as he testifies without contradiction, the business was then in a condition to begin paying. Six calves died, and four were killed by defendant, and, as we understand the testimony, there had been no increase in the herd, within the meaning of the contract. Taking it all together, therefore, the prospective profits and increase, for three years, did not promise to he so large as to preclude the idea that such a contract might have been entered into, the. more particularly when it is conceded that the cattle in reference to which it was made were then eating their heads off on a plantation belonging to the two Skannals.
We find similar corroboration of plaintiff with regard to the term of his employment, and similar conflict between the testimony of defendant and that of his chief witness, H. L. Skannal. Russell (a disinterested and unimpeached witness, who hád been employed hy defendant to build, or superintend the building of, houses on the leased property) testifies that, in a conversation between plaintiff, defendant, and himself, when “all three heard one another,” plaintiff said that his employment was for three years, whereupon defendant said:
“Yes, sir; I employed Mr. Thurmond to take charge of the Sligo Dairy Company, and I give $100 a month and one-third of the profits.”
Defendant testifies that the business was an experiment, and that plaintiff was to go there by tbe month. The property was, however, leased for three years, and some $9,000 were expended by defendant in improvements, mules, fixtures, crop making, etc., including a comfortable residence for the manager; and H. L. Skannal, being asked, “What was the discussion as to how long that management [referring to plaintiff’s management] should remain?” replied:
“Why, of course, we did not know. We were going- into a new business, and as long as everything went well we expected to remain that way.”
We fail to find from the record that there was anything that was not working well when plaintiff was discharged, and, whilst the answer of the defendant gives as a reason for that discharge the failure of plaintiff to sign the charter which had been prepared, that allegation appears to have been an afterthought and is not sustained by the proof. Nothing had been said to the plaintiff about the charter for several months prior to his discharge, and defendant, speaking of the action so taken by him, says that he told plaintiff:
“ ‘You have been so extravagant that I am going to put Brandon in charge from now on. *21 From now on, Brandon is manager of this dairy company. If you want to go ahead, if you are willing to take a subordinate place, and work for $50 a month, pay $50 on your account’ — these debts — why, he could go on. I was disgusted. Q. How much were these debts? A. Nine thousand seven hundred and some odd dollars. Here are the figures, exactly; money that we had paid out under his management.”
It appears, however, that the money was paid out for improvements made and expenses incurred under the direction of the defendant himself, and, so far as we are informed, plaintiff had little or nothing to say in the matter beyond giving orders, under defendant’s direction, for the payment of bills. The witness Hoyer says that defendant told him that:
“Thurmond ran the dairy in debt to some extent, and he had to cut down expenses; that he offered to take Thurmond at $50 a month, and he said he thought Thurmond would accept the proposition.”
The witness Roach says:
“Mr. Skannal told him [plaintiff] he would have to take $50 a month, and credit the account with $50, or leave.”
Plaintiff says:
“Mr. Skannal notified me that he could get another man for less money — for $50 a month— and that, unless I would agree to take $50 a month, he would have to replace me.”
Our conclusion, from the whole evidence, is that there was a contract between plaintiff and defendant as set forth in the petition; that, whilst there was some subsequent talk between them, no doubt in the presence of H. L. Skannal and of J. B. Ardis, defendant never thereby relinquished his right to employment as manager of the dairy for three years at a salary of $100 a month; and hence that, aside from other considerations, he was under no obligation to sign a written instrument (the charter of the proposed company), which placed him entirely at the mercy of the other contracting party and his associates. No attempt was made to prove profits, either past or prospective, and the evidence introduced fails to establish anything with regard to an increase in the herd. It is, therefore, unnecessary to inquire whether or not plaintiff’s claim, as based on those grounds, was waived by any agreement entered into subsequently to the original contract. We agree with the judge a quo that plaintiff, having been employed at a salary and for a term fixed, and having been discharged without good reason, is entitled to recover the full amount of such salary up to the expiration of the term agreed on.
Judgment affirmed.